Burke, J.
The plaintiff has conducted a drugstore and luncheonette business on the ground floor of the Beverly Hotel, located at the northeast corner of Lexington Avenue and 50th Street in New York City since its erection in 1927. In December, 1951 plaintiff, as tenant, and Beverly Hotel, Inc., as landlord, entered into a percentage lease for a term of 10 years with an option in the plaintiff to renew for an additional 10 years. On December 1, 1952 defendant Maidman became the owner of the Hotel Beverly and has been plaintiff’s landlord since that time. Prior to the time that Maidman became the owner of the hotel and until August, 1953, a part of the ground floor space not leased to the plaintiff was occupied by a restaurant named ‘ ‘ Viceroy ’ ’ which was operated by the various landlords in conjunction with the hotel.
As a result of rumors that Maidman intended to lease the space occupied by the Viceroy restaurant to the defendant Mayflower Doughnut Corp., plaintiff’s attorneys, by a letter dated December 12,1952, informed Maidman that in their opinion the rumored leasing would be a violation of plaintiff’s lease, and in the event such lease was consummated he would be responsible for damages sustained by plaintiff as a consequence thereof. Maidman’s reply stated that such a leasing would not be a violation of plaintiff’s lease. On February 4, 1953 plaintiff commenced an action against Maidman for judgment, inter alia, declaring that no other part of the building could be leased, except to plaintiff, for use as a luncheonette or similar enterprise, and enjoining defendant from renting any part of the building for such purposes to anyone other than the plaintiff. After a trial a judgment was entered on or about June 1, 1953 enjoining Maidman “ from leasing any portion of the ground floor of the building * * * for use as a luncheonette, soda fountain or for any similar business in competition with that of the plaintiff ”. This judgment was ultimately affirmed by this court (Weiss v. Maidman, 308 N. Y. 840).
During the trial of the action between plaintiff and Maidman, a lease between Maidman and Mayflower Doughnut Corp., *315 executed April 3, 1953 for a period of approximately 15 years demising the space occupied by the Viceroy restaurant to Mayflower for use as a “ restaurant and 'for the baking and sale of bakery and other food products and confections ”, was introduced in evidence. On August 17, 1953 Mayflower went into possession and commenced alterations on the demised premises. Between the 22d and the 24th of August, Mayflower caused a barricade to be erected in front of the demised premises with signs thereon stating that a “ Mayflower Coffee Shop ” would occupy the premises. In the early part of October, 1953 the plaintiff commenced this action against Mayflower, seeking to enjoin it from conducting a luncheonette or soda fountain business in the premises and from remodeling the premises for the purpose of establishing or conducting a business competitive to plaintiff’s until the termination of the plaintiff’s lease. Mayflower caused Maidman to be brought into the action and requested a determination of ultimate rights against him for alteration expenses and other damages in the event the plaintiff prevailed. Neither the plaintiff nor anyone acting on his behalf communicated with the defendant Mayflower prior to the institution o'f this action. At the time this action was commenced, Mayflower had incurred obligations and expenses in the amount of $125,000 in connection with altering the premises.
Special Term dismissed the plaintiff’s complaint after a trial, holding that plaintiff’s violation of covenants in his lease against cooking in view of his customers could not establish a basis for relief against the defendant Mayflower under its lease; that the business conducted by Mayflower is a large restaurant and not a luncheonette or business similar thereto; and that plaintiff was guilty of laches, and consequently, not entitled to an injunction. This disposition made a determination of ultimate rights between the defendants Mayflower and Maidman unnecessary. The Appellate Division affirmed without opinion.
The judgment in the action between the plaintiff and Maid-man was not res judicata as against the defendant Mayflower even though the lease between Maidman and Mayflower was then introduced in evidence (East New York & Jamaica R. R. Co., v. Elmore, 53 N. Y. 624). Nevertheless, having admitted by its answer that it had notice of the restrictive covenants in plaintiff’s lease at the time it entered into its lease with Maidman, *316 Mayflower is bound by the construction placed on these covenants. One who rents premises with knowledge of a prior restrictive covenant agreed to by his lessor in favor of another tenant is bound by the restrictive covenant and the construction placed upon it, even though he did not believe it would be so construed and relied on the advice of counsel that it would not be so construed (Waldorf-Astoria Segar Co. v. Salomon, 109 App. Div. 65, affd. on opinion below 184 N. Y. 584).
Evidence that plaintiff violated his lease by cooking in view of customers was admissible and in issue under the allegation of unclean hands set forth in the answer. However, it appears from the records on the prior appeal to this court between Weiss and Maidman that Maidman did not then raise this defense. ■ If Maidman did not raise the violation of this restriction in the lease as a defense, he waived it. Since it was waived, the plaintiff was under no legal obligation to conform to it; therefore, his conduct was not “ illegal ” and did not warrant a finding of unclean hands. Moreover, this conduct was not related to the matter in litigation between the plaintiff and Mayflower and did not injure Mayflower. The doctrine of unclean hands is only available when the conduct relied on is ■ directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct (Green v. Le Beau, 281 App. Div. 836; 2 Pomeroy on Equity Jurisprudence [5th ed.], § 399, p. 99).
The next question for consideration is whether the trial court was correct in finding that the business contemplated by Mayflower is not similar to and in competition with that of the plaintiff. In view of the affirmance by the Appellate Division we can only reverse this finding if it is not supported by any substantial evidence and is erroneous as a matter of law. (Matter of Case, 214 N. Y. 199, 203-204.) The resolution of this question, of course, depends upon substance, not names.
A review of the evidence leads us to conclude that this finding was erroneous and that, as a matter of law, Mayflower’s business is similar to that conducted by the plaintiff. Plaintiff’s business consists of a drugstore and luncheonette. The luncheonette portion of the establishment consists of a counter with about 20 stools. The food served consists of light lunches, salads, sandwiches, nonalcoholic beverages and the usual soda fountain items, such as ice cream sodas and sundaes. The *317 income from the luncheonette is approximately 40% of plaintiff’s gross receipts. A segment of a business producing this proportion of income is not incidental. It it a distinct branch of plaintiff’s business (Waldorf-Astoria Segar Co. v. Salomon, 109 App. Div. 65, affd. on opinion below 184 N. Y. 584, supra; Fitz v. Iles, [1893] 1 Ch. 77).
Mayflower’s establishment consists of a counter, tables and booths accommodating approximately 119 people. This arrangement does not conform to the typical restaurant. But this is not too significant. The issue here turns on similarity of businesses and their competitiveness. This must be determined by the character of the food served and the price charged. An examination of the menu introduced into evidence 'from another Mayflower shop which is a prototype of the establishment to be conducted in the Beverly Hotel shows that the food to be served there will be practically the same as the food served by the plaintiff. A comparison of the prices charged by the plaintiff and those to be charged by Mayflower shows that there is very little difference. True, one of Mayflower’s officers gave uncontroverted testimony that full course meals would be served in its shop at the Beverly Hotel. On the whole, however, his testimony indicates that most of the food served would be the usual “ short order ” luncheonette variety food. Furthermore, the most significant factor which indicates that Mayflower did not intend to rely on the sale of full course meals is that it expected its average check to be 50 cents, which is the same amount which obtains at the plaintiff’s luncheonette.
Most of the other evidence adduced by Mayflower had very little, if any, bearing on the issue. This evidence merely went to prove that Mayflower’s establishment would be more elaborately appointed than the average luncheonette. For example, it would have panelled walls with hand painted murals and there would be Musak to entertain the patrons. It would have a large staff of help which would include two hostesses to seat the guests and 28 waitresses to serve them. But however elegant the decor, there is no doubt that it was not to be a restaurant but a luncheonette or a business similar thereto. This is evidenced by the fact that a dishwashing machine capable of handling 6,000 dishes an hour was to be installed. Certainly no restaurant which could only accommodate 119 guests would need a dishwasher of such tremendous capacity. It seems *318 obvious from the size of this machine that Mayflower expected a concentration of short order, light meals which are the mainstay of a luncheonette, rather than full course meals which are normally obtained in a restaurant. The exquisiteness of the interior decoration would not make it a business not similar to the plaintiff’s. If anything, it would serve as an allurement to plaintiff’s present and potential customers. The fact that it was to have a large staff of help was a necessity dictated by its size. The use of waitresses is not novel in a luncheonette which contains booths or tables.
The conclusion that Mayflower’s establishment was to be a luncheonette or business similar thereto is buttressed by the addition of paragraph “ 60 ” of the lease between Maidman and Mayflower, which was added at Mayflower’s suggestion and insistence. By this clause the landlord agreed not to thereafter lease any portion of the ground floor of the premises for “ use as a restaurant, soda fountain, lunch counter, bakery or doughnut shop. ” However, it was also provided that this restriction would not apply to the leasing or use of “ any part of said building for a restaurant and liquor bar, provided meals or food served therein shall be at tables and not at any counter. ” Thus, it appears that Mayflower was not concerned with competition from a restaurant. What it did not want was competition from another lunch counter, luncheonette, soda fountain or similar enterprise. The only logical conclusion which may be inferred from this is that Mayflower was aware of the fact that its business was not to be a restaurant, but, generically speaking, a luncheonette.
Turning to the question of laches, it would also appear that this finding was erroneous. Essentially, the defense of laches consists of an unreasonable delay by a plaintiff to the prejudice of the defendant (Marcus v. Village of Mamaroneck, 283 N. Y. 325, 332). But mere delay, however long, without the necessary elements to create an equitable estoppel, does not preclude the granting of equitable relief (Galway v. Metropolitan El. Ry. Co., 128 N. Y. 132, 153-154). The sequence of events in this action shows that the delay in instituting it was not unreasonable and that plaintiff’s conduct did not cause the defendant Mayflower to change its position to its detriment.
The rumors which the plaintiff heard in 1952 were not the equivalent of notice so as to warrant the plaintiff’s joining May *319 flower in the action it instituted against Maidman (2 Pomeroy on Equity Jurisprudence [5th ed.], § 597). True, it transpired during the prior action that Maidman had entered into a lease with Mayflower, but the use clause of that lease stated that it was to be used as “ a restaurant and for the baking and sale of bakery and other food products ”. This was not sufficient to put the plaintiff on notice that the business was to be similar to his so as to warrant joining the Mayflower in the action under the provisions of section 192 of the Civil Practice Act. Furthermore, neither the court nor plaintiff’s attorney were apprised of the fact that there was a collateral writing in existence at that time which stated that the word “ restaurant ” in the use clause meant “ an eating place of a similar nature to the shop now maintained and operated by you [Mayflower] in the Savoy Plaza Hotel, New York City ”. The misleading effect of the concealment of this document was further compounded by Maidman’s testimony, whether intentional or not. Despite the fact that the Trial Judge explained to Mr. Maidman that the meaning given to the word “ restaurant ” in the Mayflower lease might be dispositive of that action and sought to elicit the existence of a collateral writing, Mr. Maidman not only denied the existence of such a document but gave further testimony which would have lead any reasonable person to believe that Mayflower intended to operate a high-class restaurant in the demised premises. In fact, at one point he testified that they were taking all his equipment and were going to operate the same restaurant he was operating. Under these circumstances the plaintiff had no reason to believe that Mayflower was going to operate anything but a high-class restaurant and it was not unreasonable to refrain from joining Mayflower at that time. The judgment in that prior action was entered on or about June 1, 1953. On August 24, 1953 the barrier was erected stating that a Mayflower coffee shop was to occupy the premises. This appears to have been the first clear indication plaintiff received that Maidman was not going to await the outcome of an appeal to the Appellate Division in the prior action before permitting Mayflower to commence its alterations. On September 8,1953 the plaintiff’s attorney checked the plans in the department of housing and buildings of the City of New York. It was then that the true nature of the establishment Mayflower intended to operate came to light. The suit was *320 commenced within three weeks thereafter. This can hardly he considered an unreasonable delay.
Assuming arguendo that the delay in instituting the action was undue, there still would be no warrant for denying equitable relief on the grounds of laches because no facts are present which would constitute an equitable estoppel. In fact the evidence quite clearly indicates that Mayflower did not change its position because of plaintiff’s conduct. Mayflower learned of the prior action in March, 1953 approximately three weeks before it entered into its lease with Maidman. At the time it entered into the lease it knew of the restrictions in the lease between Maidman and the plaintiff. It may have relied on information from Maidman that four different attorneys concurred in the opinion that Mayflower’s lease would not be violative of the plaintiff’s restrictive covenant. That was an acceptance of a known risk. But it seems that it did not rely solely on these representations. Its answer states “ that Maidman further undertook and promised either through litigation or otherwise to remove any objection by Weiss to the operation of defendant’s proposed restaurant as contemplated in the lease prior to the completion of the work of alteration, so as to ensure to this defendant the quiet enjoyment of its restaurant lease. This defendant executed said lease, relying upon the said representations and promises made by defendant Maidman and the covenant of quiet enjoyment included in the lease.” It was these representations and the covenant of quiet enjoyment that form the basis of Mayflower’s cross claim in the present action. After the judgment was entered in the prior action Maidman wanted to cancel the lease and pay out of pocket expenses to Mayflower, but it rejected this opportunity because “ we had a valuable leasehold and potential profit for a 20-year period, and a very, very substantial investment, part of which had been made, and a considerable balance was under contract or at least we were obligated for. ’ ’ Instead, it exacted a promise from Maidman that if the judgment was not reversed on appeal, he would settle the matter with the plaintiff; it also suggested that the commencement of the lease be deferred until the decision of the Appellate Division was obtained. Maidman rejected this suggestion and notified Mayflower that he was ready and able to deliver possession on August 1, 1953. The defendant had either obligated itself or incurred expenses up *321 to the sum of $55,000 by August 5, 1953. Before the commencement of this action this sum was increased to approximately $125,000. However, as the evidence shows, rather than relying on the plaintiff’s conduct, with full knowledge and awareness of the situation it assumed the risk of incurring these obligations with the assurance of the defendant Maidman that he would either prevail over the plaintiff in the courts, settle with him or reimburse it for any loss sustained as a result of his failure to do so. Mayflower chose to invest its money on these alternatives rather than any conduct on the part of the plaintiff. In view of these circumstances, as a matter of law the plaintiff was not guilty of laches (Marcus v. Village of Mamaroneck, 283 N. Y. 325, 331-332, supra; Galway v. Metropolitan El. Ry. Co., 128 N. Y. 132, 152-155, supra; Campbell v. Seaman, 63 N. Y. 568, 584). Consequently, he is entitled to an injunction against the defendant Mayflower so long as it operates its establishment in a manner that violates the covenants in his lease.
The judgment of the Appellate Division and that of Special Term should be reversed, with costs in all courts, and the matter remitted to Special Term for further proceedings not inconsistent with the opinion herein.
Conway, Ch. J., Desmond, Dye, Fuld, Fboessel and Van Voobhis, JJ., concur.
Judgments reversed, etc.