**SHOW–WORLD CENTER, INC.,**
Plaintiff,

v.

**Jeremiah T. WALSH, Individually and as Commissioner of Buildings of the City of New York, Cornelius F. Dennis, Individually and as Borough Superintendent of the Department of Buildings of the City of New York, Sidney Baumgarten, Individually and as Assistant to the Mayor of the City of New York, and Abraham Beame, Individually and as Mayor of the City of New York, Defendants.**

**No. 77 Civ. 1776.**

United States District Court,
S. D. New York.

June 28, 1977.

Herald Price Fahringer, Buffalo, N. Y., Kassner & Detsky, New York City, for plaintiff.

W. Bernard Richland, Corp. Counsel, City of New York, by Joseph Halpern, Angelo Aiosa, Gabriel Taussig, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

Plaintiff, Show-World Center, Inc., (Show-World) is a commercial establishment occupying the basement, the street level, and a small portion of the second floor of a 12-story office building located on the corner of Eighth Avenue and 42nd Street. This is in the heart of New York City's Times Square area. Show-World's business is sex. It specializes in the sale of sexually oriented books and films. It also provides peep shows and live entertainment. Defendants are all New York City officials, including the Mayor, Abraham Beame. Show-World sues defendants complaining that on March 25, 1977 Show-World was vacated from its premises pursuant to an administrative order on the ground that there is *"imminent danger to the safety and life of the occupants"* of the entire building (Peremptory Vacate Order issued by Manhattan Borough Superintendent of Buildings, emphasis in original). The gravamen of Show-World's complaint is that the Peremptory Vacate Order (Vacate Order) is a subterfuge for banning its constitutionally protected free speech activity,[1] and is part of a campaign initiated by defendants and financed by local and federal funds to ban all such activity from the Times Square area. Pending a final determination of its lengthy complaint, Show-World now seeks a preliminary injunction restraining defendants from enforcing the Vacate Order. A temporary restraining order was issued by this court on April 15, 1977 restraining enforcement of the Vacate Order pending determination of the instant motion.

Defendants deny that they are seeking to interfere with plaintiff's First Amendment Rights. Defendants expressly reject the suggestion that they seek to put plaintiff out of business because they believe plaintiff is engaged in 1) obscenity, or 2) the sale of constitutionally protected sexually oriented materials which defendants find distasteful, or 3) the conduct of an establishment which is contributing to the decline of the Times Square area as an entertainment center. There is no action pending in the state court charging this plaintiff with obscenity or any other law violation. Defendants claim they are proceeding only against Show-World's landlord under their authority to prevent danger to life and limb emanating from conditions determined by them to be dangerous building conditions or fire hazards.

However, after a hearing on plaintiff's motion, it remains undisputed that the only tenant of the building against whom the Vacate Order was enforced on March 25 was Show-World, thus lending strong support to Show-World's claim that the Vacate Order is a stratagem for scuttling the exercise of free speech. For the reasons set forth below, the motion for preliminary injunction is granted.

### Statement of Facts

Many of the other relevant facts are not disputed. As noted above, Show-World occupies the lower floors of a twelve story office building at 303 West 42nd Street. The corporate landlord is 303 West 42nd

---

1. Show-World alleges that the City has violated its rights under 42 U.S.C. § 1983, and jurisdiction is therefore based on 28 U.S.C. § 1343.

Street Corporation (303 Corp.). Show-World operates a live theatre in the basement of the premises,[2] sells magazines, offers peep shows on the first floor, and has offices on a small portion of the second floor. The entire space occupied by Show-World is interconnected. There are two exits to the street on the first floor: one on Eighth Avenue and the other on 42nd Street.

The remaining portion of the second floor and the entirety of floors three through twelve are occupied by 117 other and diverse tenants. Show-World is the only tenant involved in sexually oriented activities. Each floor has but a single exit to the street via a fire tower which finally exits through Show-World's 42nd Street exit. It is conceded that this means of egress was acceptable to the City when the building was constructed in 1928. However, this single exit for floors two through twelve does not satisfy the two-exit requirement of the 1938 and 1968 New York City building codes. It is also conceded, however, that *Show-World's* two exits are legal under today's City building code.

Show-World's premises were formerly occupied by a bank. In early 1974 plans were drawn to renovate the former bank area to accommodate Show-World. These plans were personally approved in their entirety by defendant Cornelius F. Dennis, who is now the Manhattan Borough Superintendent of the Department of Buildings (and who is answerable to defendant Jeremiah T. Walsh, the New York City Commissioner of Buildings). A building permit for the renovation was issued in July of 1974. The work was completed—according to the revised plans—at a cost of approximately $200,000. Due to the major changes in 303 Corp.'s premises, a new Certificate of Occupancy had to be issued for the entire building. A Temporary Certificate of Occupancy, valid for 90 days, was issued on July 23, 1975. A permanent certificate was not issued since the building elevators had not

been inspected at that time due to a manpower shortage in the Building Department.

On September 25, 1975 defendant Walsh applied to the New York City Board of Standards and Appeals (Board) for a change in 303 Corp.'s Certificate of Occupancy which would, in essence, allow Walsh to order the landlord to install a sprinkler system throughout the entire building. The estimated cost of this system is in excess of $100,000. Hearings before the Board were held in January and February of 1976. On March 9, 1976 the Board granted Walsh's request.

On April 7, 1976, 303 Corp. (*not* Show-World) filed an Article 78 petition in the State courts in an attempt to overturn the Board's sprinkler ruling. Supreme Court Justice Spiegel dismissed the petition on December 7, 1976. Judgment was entered on January 20, 1977. The dismissal of 303 Corp.'s Article 78 petition is presently on appeal to the Appellate Division.[3] At this writing there has been no adjudication of this appeal.

The above chronology of 303 Corp.'s litigation serves as background to the events which began on March 25, 1977. It was on this date that the Buildings Department, per Superintendent Dennis, issued the Peremptory Vacate Order. On its face, the Order required that the entire twelve story building be vacated *"because there is imminent danger to the safety and life of the occupants . . . "* (emphasis in original). Pursuant to the Order, Show-World was actually evicted from the premises on March 25, 1977. And it was on this date that Show-World alleges that its cause of action in this litigation arose.

A slight digression is necessary to identify one of the other defendants, Sidney Baumgarten. The Midtown Task Force (MTF) is in the nature of an ad hoc committee whose task is to coordinate the activities

---

**2.** The precise nature of the shows performed in the theatre is a matter of dispute between the parties, but there is no claim of obscenity in connection therewith in this action.

**3.** This appeal was perfected on April 4, 1977, i. e. after the Vacate Order had been issued.

of various City agencies in its investigation of, among other things, sexually-oriented businesses in Times Square. Defendant Sidney Baumgarten, an assistant to Mayor Beame, directed the activities of the MTF during the time in which the events here in question occurred.

At the hearing on the instant motion substantial evidence was introduced which tended to show that one of the aims of the MTF was to rid Times Square of sexually-oriented establishments, such as Show-World. In any case, it is clear that the Buildings Department's files on Show-World and other establishments were turned over to the MTF for its perusal. In addition, the MTF, in close liaison with the Buildings Department, arranged that no building permits be granted to these establishments until they had been approved by the MTF. Edward Triconi, a Building Department Inspector, was assigned full time to the MTF to assist it in its inspection of potential building violations.

In light of this background, the precise sequence of events leading up to the issuance of the Vacate Order is important. On March 25, 1977 Sidney Baumgarten called Cornelius Dennis and suggested that a vacate order should be issued against 302 West 42nd Street. Baumgarten explained the reasons why he thought the order should issue, subsequently confirming them in a memorandum to Dennis.[4] Despite the fact that, until this phone call, Dennis had no thoughts of issuing a vacate order, he immediately issued the Vacate Order when the phone call terminated. The Vacate Order, which was based on a finding of "imminent danger," was issued without confirming that Baumgarten's reasons were correct and without any subsequent inspection of the 303 premises by a member of Dennis' staff. Moreover, the landlord of 303 West 42nd Street was not then contacted in an attempt to eliminate those conditions which made the building unsafe.

On March 25 at 1:00 P.M. Dennis signed the Vacate Order. It was served upon Show-World at approximately 2:00 P.M. by Edward Triconi. He was accompanied by approximately 35 New York City policemen. Although Show-World was physically evicted at this time, the remaining 117 other tenants were not evicted. The City's explanation is that the Building Department day crew works only until 4:00 P.M. and, consequently, there was not time to serve a copy of the Vacate Order on the remaining tenants.[5] The Vacate Order was turned over to the Buildings Department's night crew which posted copies of it in the lobby and on all the floors of the building. Since March 25 was a Friday, defendants

4. The caption of this memorandum, dated March 25, 1977 (Exh. X) reads, in pertinent part: "RE: Issuance of Department of Buildings' Vacate Order for the Basement, First Floor, Mezzanine and Second Floor—669 Eighth Avenue [i. e. 303 West 42nd Street], City, County, and State of New York". Superintendent Dennis has steadfastly maintained that the Vacate Order was issued against the entire building. This was apparently not Baumgarten's understanding.

The memorandum listed the bases for the Vacate Order. Dennis claims that No. 8) was not discussed on the telephone and was not a basis of the Vacate Order:

1) Occupancy of the building without a Certificate of Occupancy;
2) Excessive number of peep shows in violation of the City's Zoning Ordinance;
3) Dressing room without proper sprinkler system;
4) Use of mezzanine theatre without a permit [no such theater was in use];

5) Criminal Court summonses have been served with respect to the above, and the conditions remain uncured;
6) Failure to install sprinkler system;
7) History of Fire Department violations;
8) 50 arrests have been made on the premises for obscenity in the second degree and other sex-related crimes;
9) History of Health Department and Department of Consumer Affairs violations.

5. The City has never satisfactorily explained why the balance of the building could not have been vacated during the period between 2:00 and 4:00 P.M. Also, the City's explanation that the day crew went off duty at 4:00 P.M. seems a bit thin considering the large police force mustered to vacate the building and the fanfare which accompanied the eviction. The City would have us believe that this large task force simply disbanded in the middle of its operations when the clock struck 4:00. (There is no evidence on the record to indicate when either the police or other officials left the area.)

claim that none of the other 117 tenants occupied the building over the weekend. Show-World was the only tenant affected by this action.

On Monday, March 28, the President of 303 Corp., Wallace Katz, was approached by a member of the Buildings Department who intended to vacate the remainder of the building. Mr. Katz informed this person that he intended to take legal action against the Vacate Order. At this point, the defendant's contention is that the Buildings Department decided to withhold any further enforcement of the Vacate Order pending the conclusion of these upcoming proceedings.

On that Monday afternoon, 303 Corp. moved for a stay of the Vacate Order in the Appellate Division of the State Supreme Court. The parties appeared before Justice Capozzoli late Monday afternoon. Justice Capozzoli found that he could not rule on the motion for a stay without a proper record. He referred the matter to Special Term and suggested that the matter would be ripe for his review after a record had been made below.

Justice Capozzoli did one other thing upon which defendants place great emphasis. He noted that, by late Monday afternoon, only Show-World had been vacated and that the remaining 117 "innocent"[6] tenants could probably safely remain in the building until the hearing in Special Term. Justice Capozzoli telephoned Commissioner Walsh who agreed not to vacate the remainder of the building until Special Term ruled on 303 Corp.'s motion for a stay of the Order. 303 Corp. also concurred in Justice Capozzoli's suggestion.

The parties appeared in Special Term on Wednesday, March 28 before Justice Gellinoff. According to Show-World, it soon became clear that the Buildings Department had abandoned any intention to enforce its Order as to the 117 other tenants and was proceeding only against Show-World. During all of these proceedings (and in the Article 78 proceedings as well)

303 Corp. was represented by Ralph J. Schwarz, Jr. (Schwarz) who is also general counsel to Show-World. When Schwarz perceived that the Buildings Department was acting solely against Show-World, he decided that Show-World should be separately represented and called in outside counsel on its behalf. Mr. Herald Price Fahringer has since represented Show-World.

On April 7 Justice Gellinoff denied 303 Corp.'s motion for a stay of the Vacate Order. On April 13, 1977 Show-World became a plaintiff—for the first time in any of these proceedings—when it filed this action in federal court. After hearings on April 14 and 15 this court granted a temporary order restraining defendants from taking any steps to enforce the Vacate Order. Hearings on the preliminary injunction were held on April 20, 21, 22, 25, 26, 27, 28, 29 and May 3, 1977.

*Privity of Show-World and 303 Corp.*

A threshold issue of critical importance to disposition of the preliminary questions in this case (i. e. abstention and res judicata) is the nature of the relationship between Show-World, the plaintiff in this action, and 303 Corp., the plaintiff in the two State court proceedings. The only clear, undisputed facts on this issue are that Show-World was a tenant of 303 Corp., and that both corporations have had dealings with one attorney, Ralph Schwarz. Mr. Schwarz has been General Counsel to Show-World since 1974, when he handled that entity's incorporation and negotiated its lease with 303 Corp. During the lease negotiation, 303 Corp. was represented in the main by its President and sole shareholder, Wallace Katz, who looked to another lawyer for legal advice on that occasion. Mr. Katz owns no part of Show-World and 303 Corp. owns no part of Show-World.

During the State court proceedings, Mr. Schwarz represented only 303 Corp. although, on two occasions in the State court,

---

6. "Innocent" in the sense that Justice Capozzoli believed that it was a connecting door on

Show-World's premises which increased the risk of fire to the point of "imminent danger."

he did identify himself as being also the attorney for Show-World, allegedly to provide support for his assertion of personal knowledge of some of the facts there in issue. He admitted at the hearing in the instant case that he kept his client, Show-World, informed as to the course of the proceedings before the Board of Standards and Appeals. However, he made clear in this court that he at no time represented Show-World *as a party* in the State courts.

On the basis of these facts adduced at the hearings thus far in the case, the court finds no privity between Show-World and 303 Corp. such as to equate the interests of the two entities in the State proceedings, and, thereby, to preclude the litigation by Show-World in this court.

■ Assuming, without deciding, that Show-World might have had standing to intervene in either or both of the State proceedings to date, that fact alone would not be sufficient to bar this action. The fact that a party has a right to intervene, which it chooses not to exercise, is not enough to make it bound by a judgment in the proceeding in which it possessed such a right. *Brown v. Wright,* 137 F.2d 484, 487 (4th Cir. 1943); *Western Union Telegraph Company v. Foster,* 247 U.S. 105, 38 S.Ct. 438, 62 L.Ed. 1006 (1918).

■ Moreover, the mere existence of a landlord-tenant (lessor-lessee) relationship is insufficient to bind the tenant to the adjudication in the prior litigation to which the landlord only was a party. While there is language in the two cases cited to the court by defendants which would tend to indicate that under some circumstances, the "privity of estate" between landlord and tenant may cause the latter to be bound by prior judgments to which the landlord only was a party, *Kruger & Birch, Inc. v. Du-Boyce,* 241 F.2d 849, 854 (3rd Cir. 1957); *Fouke v. Schenewerk,* 197 F.2d 234, 236 (5th Cir. 1952) (dictum), those cases appear to involve only disputes relating to either title to, or right to possession of, real property. *See* 50 C.J.S. Judgments § 801 and cases cited therein; *cf. Weiss v. Mayflower Doughnut Corp.,* 1 N.Y.2d 310, 152 N.Y.S.2d

471, 474, 135 N.E.2d 208 (N.Y.1956); *Traveler's Insurance Company v. United States,* 283 F.Supp. 14, 31 (S.D.Tex.1968). Certainly this court has been cited no authority for the proposition that a landlord's derivative assertion of his tenant's constitutional rights in a proceeding to which the tenant was not a party should bind the tenant in a later proceeding in which the tenant seeks to raise those important rights directly. In view of the possible conflict of interest between landlord and tenant, whose rights a landlord might, at least hypothetically, be willing to sacrifice, there appears to be no basis for binding the tenant to the former adjudication on the basis of its relation to the landlord *qua* landlord.

■ Finally, and most clearly, privity is not established from the mere fact that Show-World may happen to be "interested" in the same question at issue in the earlier proceedings in the New York courts, whether by way of establishing a proposition of law, or by proving or disproving some state of facts. *Sodak Distributing Co. v. Wayne,* 77 S.D. 496, 93 N.W.2d 791, 795 (1958); *Howard v. Fairmont Machinery Co., Inc.,* 101 F.Supp. 778, 779 (E.D.Ky.1951). Nor does the fact that the prior decision might affect Show-World's action in this court as a favorable or unfavorable judicial precedent cause Show-World to be considered a privy to 303 Corp. in the earlier proceeding. *Bigelow v. Old Dominion Copper Mining & Smelting Co.,* 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009 (1912).

*Res Judicata*

■ When this action was commenced, the court, *sua sponte,* had raised the possibility that Show-World may be precluded from litigating its First Amendment claims on the principal of *res judicata.* It then appeared that 303 Corp. may have raised similar constitutional claims in its Article 78 proceeding. There was, therefore, a question as to whether Show-World was in privity with 303 Corp. so as to make the State court's adjudication binding upon Show-World.

Defendants must prove these elements to support a defense of res judicata: (1) there must have been a final judgment on the merits in the prior action (2) by a court of competent jurisdiction; (3) the cause of action in the second action must have been the same as in the prior action; and (4) the party against whom the defense is asserted must have been a party or in privity with a party to the prior action. *Herendeen v. Champion International Corp.*, 525 F.2d 130, 133 (2d Cir. 1975). The parties dispute whether there was a final judgment on the merits in the Article 78 proceeding which was dismissed in the New York State Supreme Court, but the court finds that *res judicata* does not apply because neither the cause of action nor the parties are the same in this federal action.

In the Article 78 proceeding, the issue was whether the Board of Standards and Appeals ruled correctly when it ordered 303 Corp. to install a sprinkler system in its entire building. In this proceeding, the question is whether the constitutional rights of Show-World were violated by the entry of the Vacate Order and its enforcement only as to Show-World. It is true that in both the State and federal cases the claim is made that the City's actions were motivated solely by a desire to shut down Show-World because of its exercise of its First Amendment rights. But the issues are hardly identical since, subsequent to the time that 303 Corp.'s Article 78 cause of action accrued, a whole new series of events transpired setting the stage for Show-World's eviction. The First Amendment issues are similar in the two cases but hardly identical for *res judicata* purposes.

Secondly, the party against whom *res judicata* is being asserted, Show-World, was not a party to the Article 78 proceedings nor (as discussed above) was (or is) Show-World in privity with 303 Corp.

*Abstention*

 Defendants entreat this court to abstain from adjudicating plaintiff's constitutional claims on the basis of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny, *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). This court finds that abstention is inappropriate in this case and that the merits should be reached.

The thrust of defendants' argument is that Show-World's claims really belong in the State court. The 303 Corp.'s Article 78 petition, attacking the sprinkler order, is presently on appeal after having been dismissed in the New York State Supreme Court. If the Appellate Division decides to overrule the decision of the Board so that 303 Corp. need not install its sprinkler system then there may be no basis on which to vacate any of 303 Corp.'s tenants, including Show-World. In addition, argues defendants, there is another line of State litigation which should be pursued by the parties rather than allow the plaintiff to proceed in federal court. On March 28, after Show-World had been evicted, 303 Corp. applied to the Appellate Division for a stay of the Vacate Order. Justice Capozzoli sent the parties to Special Term to develop a record on which he could rule. He expected that after appearing in Special Term, the parties would appeal any adverse determination to him. The 303 Corp. never did appeal. Rather, Show-World sued in this court approximately one week after Special Term denied 303 Corp.'s stay. Defendants here strongly urge that this court let the New York State Appellate Division rule on 303 Corp's and Show-World's claims.

Another point which defendants make in support of their abstention claim is that the policy of the doctrine mandates abstention in this case. Defendants note, correctly, that a New York State court (Justice Gellinoff) has already ruled that the Vacate Order should not be stayed and that the First Amendment claims (albeit advanced by 303 Corp. and not Show-World) were not sufficiently substantiated to scuttle a valid administrative determination that a vacate order is warranted. It is argued that what follows from these observations is that, if this court decides to stay the enforcement

of the Vacate Order, it will have, *sub silentio,* overruled a prior State court determination.

Plaintiff's response is that it was not a party to the State court proceeding and that none of those proceedings should be binding upon it. Show-World adds that it was not until Wednesday, March 30—when it became apparent that the City was enforcing the Vacate Order only as to Show-World—that Show-World determined that its rights were not being sufficiently protected by its landlord and decided to press its own claims in federal court under 42 U.S.C. § 1983.

Defendant's reliance on *Younger* is not warranted under the facts of this case for at least three reasons: (1) Show-World was not a party to either State court proceeding; (2) there was no state action pending as to the Vacate Order when this federal action was commenced; and (3) Show-World's claim is that it is the victim of bad faith law enforcement.[7]

As already noted, defendants have not sustained their burden of proving that there was any privity between 303 Corp. and Show-World in any of the State proceedings such that Show-World could be considered a "party" in the State courts. Show-World and 303 Corp. did have a "community of interest" in the sense that during the Article 78 proceedings, 303 Corp. argued that the Buildings Department ordered the sprinkler installation as a pretext to get rid of Show-World. However, the landlord probably could *not* assert Show-World's First Amendment rights for its own benefit (regardless of the language of the landlord's complaint) but could only use these claimed constitutional violations as evidence that the sprinkler order was not motivated by valid building considerations. *See generally McGowan v. State of Maryland,* 366 U.S. 420, 429, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). In any case, the fact still remains that Show-World was not a party to any State Court proceedings.

Show-World's cause of action with respect to the Vacate Order arose on March 25, 1977 when it was the only tenant vacated from the building. At that time it had the choice to litigate in federal or state court. *City Bank Farmers Trust Co. v. Schnader,* 291 U.S. 24, 34, 54 S.Ct. 259, 78 L.Ed. 628 (1934); *Preiser v. Rodriquez,* 411 U.S. 475, 477, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (dictum). Show-World was not obligated by intervention to appeal the unsuccessful attempt to stay the vacate order in Special Term or bring its own state court action for this purpose. It was entitled under federal law, 42 U.S.C. § 1983, to vindicate its constitutional claims in a federal forum. 28 U.S.C. § 1343.

Since Show-World neither is, nor ever was, a party to either State court action, and since there was no pending state court proceeding regarding the Vacate Order complained of here, to which the federal court should give deference, the *Younger* abstention is inapplicable. *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 603, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *cf. Younger,* 401 U.S. at 41, 91 S.Ct. 746.

Secondly, *Younger* (at 48, 91 S.Ct. 746) and other cases hold that abstention is not required when the claim is that the state's laws are being enforced maliciously or in bad faith. *Huffman, supra,* 420 U.S. at 611, 95 S.Ct. 1200; *Dombrowski v. Pfister,* 380 U.S. 479, 489–90, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Since that is precisely the claim in this instance, and since there was evidence introduced on the hearing of the instant motion from which the court finds a likelihood of success on the merits of this claim and the possibility of irreparable injury since First Amendment rights are involved, abstention is not warranted. *Dombrowski, supra.*

As an alternative to *Younger*-type abstention, defendants suggest that this court should refrain from deciding the case under

---

**7.** The court assumes for the purpose of this discussion that *Younger,* as extended by *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), would apply to this case under the theory that a city's enforcement of its building code is an "important interest" such that notions of comity between state and federal courts would mandate abstention.

the principles of "equitable abstention". *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The court feels that the principles of equity mandate federal adjudication of the issues raised in this case—which include the bad faith enforcement of the New York City building code in order to suppress plaintiff's First Amendment rights. *See especially Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976): "Abdication of the obligation to decide cases can be justified under this [the abstention] doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." (Citing *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959)).

*Equal Protection—First Amendment Claims*

In addition to its First Amendment claim, Show-World says that it is entitled to a preliminary injunction on the basis of any one of three independent constitutional theories: 1) the Vacate Order constituted a taking of Show-World's property without due process of law; 2) Show-World was denied the equal protection of the laws because other Manhattan buildings which were significantly more dangerous than 303 West 42nd Street were not ordered vacated; and 3) Show-World was denied the equal protection of the laws because of all the tenants in the building, *only* Show-World was vacated.

■ It is not necessary, at this stage of the proceedings, to rule on all of the grounds asserted by Show-World. However, it is plain that the enforcement of the Vacate Order against Show-World only and not against any of the other 117 tenants in the twelve story building can be viewed as a violation of Show-World's right to the equal protection of the laws. But this claim is inseparable from plaintiff's First Amendment claim. Plaintiff claims that the Vacate Order, itself, was a device for suppressing First Amendment rights. Furthermore there is a strong likelihood that at the trial Show-World will be able to prove that the *issuance* of the Vacate Order was a subterfuge for violating its First Amendment rights.

Show-World would be denied the equal protection of the laws if it could show that the Vacate Order was being enforced in a discriminatory manner stemming from an illegitimate motive on the part of the City, *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), or if it could be shown that the discrimination was "intentional and purposeful." *Powell v. Power,* 436 F.2d 84, 88 (2d Cir. 1970).

The Vacate Order concededly applied to the entire premises, yet only Show-World had been vacated by April 7 after Judge Gellinoff had denied 303 Corp.'s motion to stay the Vacate Order.[8] A week later when this action was commenced that was still the case. This was a rather inexplicable state of affairs from a safety point of view (the sole justification of the Vacate Order was that *"there is imminent danger to the safety and life of the occupants"*) since the Show-World premises were the safest portion of the entire building in terms of exits and sprinklers in portions of Show-World premises which had been installed during the renovation of the premises for Show-World. The primary reason why the building was deemed unsafe was that the upper eleven floors had only one means of egress in violation of the building code. Since the landlord had failed to install a full sprinkler system as Commissioner Walsh had ordered,

---

8. Defendants cannot find succor in the fact that Justice Capozzoli reached an informal agreement with Commissioner Walsh not to vacate the other 117 tenants. The agreement was an informal one which did not bind the City if the City had truly determined that there was immi- nent danger to the tenants in the building. More importantly, that agreement was to maintain the status quo only until the parties appeared before Justice Gellinoff two days later, March 30, 1977.

the building was unsafe for the occupants. In his affidavit in the State Court, Commissioner Walsh did contend that Show-World's premises were unsafe, but there is a likelihood that upon the trial this contention will be disproved. Furthermore, unlike the rest of the building, Show-World has always had two exits to the street in full compliance with the City building code.

In fact, it has been established that the Buildings Department has increased any danger to the occupants of the upper eleven floors by vacating only Show-World. An insurance expert testified that the danger of fire is always greater in vacant premises primarily because of the attraction to vandals and because there would be no one about to extinguish a fire once it had begun.

*Police Department v. Mosley*, 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972) teaches that "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." Similarly, administrative actions affecting First Amendment rights such as those enjoyed by Show-World must also be tailored to preserve the expression of those rights. The City, in closing down only Show-World (apparently the only tenant exercising First Amendment rights in 303 West 42nd Street) accomplished just the opposite result by precisely tailoring its actions to suppress the exercise of Show-World's rights.

The Equal Protection and First Amendment issues are inherently intertwined in this action. The court's preliminary finding that the Vacate Order was discriminatorily enforced as against Show-World lends strong support to Show-World's charge that the Vacate Order was issued with the aim of suppressing its free speech activities. The Supreme Court has said that federal courts must "look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963). Plaintiff has made a showing that the actions of the Buildings Department essentially constituted such a prior restraint on Show-World's free speech activities. As such, the action of the Borough Superintendent "comes to this [c]ourt bearing a heavy presumption against its constitutional validity." *Bantam Books* at 70, 83 S.Ct. at 639. In addition there was strong evidence that the Vacate Order could have been more carefully drawn so as to vacate only those tenants of the building who were allegedly in imminent danger (i. e., those on the upper eleven floors with only one exit and no sprinklers). Instead, as previously noted, the Vacate Order was enforced only with respect to the safest portion of the building.

Therefore, considering the fact that the enforcement of the Vacate Order only against Show-World has not been explained from a safety point of view, and considering the fact that the Vacate Order, as enforced, was directed at the only business which was exercising First Amendment rights on the premises, this court finds that there is strong likelihood that, at trial, Show-World will succeed in proving that the Vacate Order was discriminatorily enforced with the intent of suppressing Show-World's First Amendment rights. Under these circumstances the courts have held that there is a sufficient showing of irreparable injury to warrant injunctive relief. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *Fortune Society v. McGinnis*, 319 F.Supp. 901, 903 (S.D.N.Y.1970); *Bradford v. Wade*, 376 F.Supp. 45, 46, 48 (N.D.Tex.1974).[9]

A preliminary injunction will, therefore, issue.

---

9. Although none of the parties have raised the question whether or not Show-World can assert First Amendment rights, the cases have held that corporations can assert such rights in circumstances such as these. *Bantam Books, Inc., supra (sub silentio)*; *Black Jack Distributors, Inc. v. Beame*, 433 F.Supp. 1297 (S.D.N.Y. 1977) (Cannella, J.) and cases cited therein.

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Mootness*

On June 22, 1977, as the foregoing opinion was being typed, there was hand delivered to the court a letter, dated the same day, from Joseph Halpern, counsel for defendants, advising the court that on that very day Borough Superintendent Dennis had rescinded and withdrawn the Vacate Order for the entire building. A copy of a letter from Dennis to Ralph Schwarz, attorney for the owner of the building, officially advising that the Vacate Order had been rescinded was attached to Mr. Halpern's letter. Also attached to Halpern's letter was a copy of a memorandum from Dennis to Halpern, with copy to Schwarz, dated May 24, 1977, listing repairs or work to be done immediately at "303 West 42nd Street—Show World":

"1) Repair all main stair doors (2 per floor) to operate smoothly.

2) Remove cubicles in 2nd story meeting room or sprinkler the room.

3) File a report from the sprinkler mechanical engineer regarding the installation of sprinkler heads in the non-approved mezzanine dressing room.

4) Relocate sprinkler heads or install valance at open stair at 8th Avenue wing—1st floor.

5) Make all egress doors from cellar, public assembly area, smoothly operable.

6) Remove hold open devices from F.P.S.C. doors.

"During the course of our inspection two standpipes with hose racks were found on the second to twelfth [sic] floors. The cellar and mezzanine levels were found to be protected with fire stand pipe hoses. The arrangement and use of the main (1st) floor and mezzanine floors were found to be contrary to the plans filed with this department. New as built plans will have to be filed and approved."

The letter of June 22, 1977 from Dennis to Schwarz, attorney for the owner of the building, rescinding the vacate order reads as follows:

"Various items of work or repair, listed in a memo from me to Assistant Corporation Counsel, Joseph Halpern, dated May 24, 1977, were found complied with on inspection of June 7th.

"Item 3 related to sprinkler heads, located in the mezzanine dressing room, has been found to operate properly as stated by your engineer, David Blinder, P.E., on a report submitted to this office today. Mr. Blinder has also reviewed the sprinkler heads located on the first floor near the 8th Avenue entrance and finds that they will respond to fire and heat.

"Accordingly, Vacate Order # 31/1977, issued by this office on March 25, 1977, is hereby rescinded."

The letter from Mr. Halpern to the court reads as follows:

"This letter is written to advise you of certain actions taken by the parties in the above-captioned action with respect to the Peremptory Vacate Order issued by the Department of Buildings against 669 Eighth Avenue, New York City.

"On May 19, 1977, Cornelius F. Dennis, Borough Superintendent of Manhattan, Department of Buildings, inspected the premises at 669 Eighth Avenue. He was accompanied by Neil Berzak, architect for Show World, and Wallace Katz, president of the corporate owner of the entire building. Attorneys for both sides were present. Together these parties toured the building and agreed that certain items of required work be done in the Show World and other parts of the building, which work would remove the imminent peril upon which the vacate order had been predicated. A copy of a memorandum from the Borough Superintendent, dated May 24, 1977, which itemizes the required repairs, is enclosed. The violation issued for failure to install sprinklers throughout the building was excluded from the agreement because this violation is the subject of a law suit which is presently before a state appellate court.

654

"On June 7, 1977 an inspection was conducted at the subject premises by two inspectors of the Department of Buildings. These inspectors reported that the required repairs listed in the May 24th memorandum had been done, with the exception of item 3 which required a report from the owner's mechanical engineer. This report was received by the Borough Superintendent on June 22, 1977. The Borough Superintendent promptly proceeded to rescind and withdraw the vacate order for the entire building by letter dated June 22, 1977, a copy of which is enclosed.

"It is respectfully submitted that these developments render moot your consideration regarding the issuance or denial of a preliminary injunction and should constitute the basis for dissolution of the temporary restraining order. Moreover, it appears that the absence of an existing case or controversy divests this Court of jurisdiction and warrants dismissal of the complaint."

The court held a hearing on the mootness issue on June 27, 1977. Mr. Fahringer, attorney for Show-World, was unable to appear because he was then involved in a court hearing in Rochester, New York. A letter setting forth Mr. Fahringer's views was, therefore, dictated by him over the telephone to Mr. Schwarz for presentation to the court on this hearing. Mr. Schwarz is attorney for the owner of 303 West 42nd Street. He sat with Mr. Fahringer throughout the trial of the instant motion and is therefore familiar with all of the proceedings on this motion. He testified as a witness on the hearing of the motion for preliminary injunction.

Among other things, the Fahringer letter says:

"Show-World has no guaranty that in the near future the defendants will not issue another vacate order against it for the very same reason that formed the subject of this lawsuit. Mr. Dennis' withdrawal letters of May 24 and June 22, 1977 do not discuss the reasons which were the subject of the March 25, 1977

vacate order. Further, this eventuality of reissuance of a new vacate order is not unlikely in view of the defendants' long history of harassment of Show-World, as developed in detail at the hearings. * * The matter is not moot. Thus, a judicial resolution of the issues before this Court is absolutely essential in order to define the rights and liabilities of the parties in this important litigation. The defendants' strategic withdrawal of their ill-advised vacate order should not under any circumstances be allowed to subvert the process of this Court. Moreover, it is imperative that this Court maintain jurisdiction over this litigation, in its early stages, because further supervision may be needed. [emphasis in original]

" * * * The Court will recall the testimony of Mr. Schwarz establishing how the City had engaged in a course of illegal acts and then, when judicial relief was sought they rescinded their actions and withdrew from the litigation. For example, he testified how these tactics were used after the Cross Roads was closed down on July 7, 1976 and how the City belatedly returned Show-World's booths, film projectors, and film-viewing machines after they had been unlawfully confiscated."

This court holds that the case is not moot. See United States v. W. T. Grant, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Gray v. Sanders, 372 U.S. 368, 376, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Seay, et al. v. McDonnell Douglas Corporation, 533 F.2d 1126, 1130 (9th Cir. 1976). Voluntary cessation of allegedly illegal conduct does not deprive this court of the power to hear and determine this lawsuit. A bona fide controversy remains to be settled as to the legality of defendants' methods for regulating the buildings which house sexually oriented establishments in the Times Square area. There was uncontradicted testimony by Mr. Schwarz on the trial of the motion for preliminary injunction to the effect that Show-World and other similar businesses in the Times Square area had been harassed in the past by illegal acts which were abandoned when suit was filed. Defendants

have the burden, which they have not yet met, of showing that there is no reasonable expectation that the wrong will be repeated. *United States v. W. T. Grant, supra*, 345 U.S. at 632, 73 S.Ct. 894; *see Black Jack Distributors, Inc., et al. v. Beame*, 433 F.Supp. 1297 (Cannella, J.). (S.D.N.Y.1977).

Moreover, there is great public interest in having the legality of the practices settled. *See United States v. W. T. Grant, supra*, 345 U.S. at 632, 73 S.Ct. 894. This court takes judicial notice of the fact that defendants' campaign against sex oriented establishments in the midtown area of the Borough of Manhattan (about which there was evidence on the hearing of the motion for preliminary injunction) has received widespread publicity in the community via newspaper publicity and television news stories. Rule 201, Federal Rules of Evidence. The court also takes judicial notice of the fact that Judge Cannella's decision in the *Black Jack Distributors, Inc.* case, *supra*, was attacked in a lead editorial on June 23, 1977 in the Daily News as a perversion of the First Amendment. In that case, Judge Cannella preliminarily enjoined the Police Commissioner of the City of New York from causing any further harassment of the plaintiff sex oriented bookstores "through enforcement of the obscenity laws undertaken in bad faith and for the purpose of injuring plaintiffs' business, or to cause them to close." (at p. 1309). There is clearly a need for these cases to proceed and for review by appellate courts.

Since the action is not moot, defendants are not entitled to a dismissal of this action as requested as a matter of right. *United States v. W. T. Grant, supra*, 345 U.S. at 632, 73 S.Ct. 894.

However, there appears to be no need at this time for the issuance of a preliminary injunction enjoining enforcement of the Vacate Order. The Vacate Order has been rescinded and withdrawn as to the entire building. Borough Superintendent Dennis indicated on the trial that he was awaiting this court's ruling on the motion before proceeding to enforce further the Order against the entire building. This court finds it difficult to believe that, having been advised by counsel for defendants that the order has been rescinded and withdrawn, it would be reinstated without an opportunity for plaintiff to be heard and without the prior approval of this court.