OPINION OF THE COURT
Friedman, J.
“When premises are leased for an expressed purpose, everything necessary to the use and enjoyment of the demised premises for such expressed purpose must be implied where it is not expressed in the lease” (Gans v Hughes, 14 NYS 930, 931 [Brooklyn City Ct 1891], citing Kelsey v Durkee, 33 Barb 410 [Sup Ct, NY County 1861]; see also 1 Ambert, McAdam on Landlord and Tenant § 86, at 330 [5th ed]). In this case, therefore, under the commercial lease that permits “fast food cooking” in the bar the plaintiff tenant operates on the first floor of a two-story building, the tenant has an implied appurtenant right to install, at its own expense, an exterior exhaust vent and associated fan and ductwork necessary to the operation of a kitchen in the demised premises. Further, the defendant landlord may not unreasonably withhold consent to the location and design the tenant proposes for such equipment.
On the foregoing grounds, we affirm the order appealed from to the extent it grants the tenant a mandatory preliminary injunction directing the landlord to permit the tenant to install, at its own expense, a new exterior exhaust vent on the roof of the building, along with the necessary ducts between the kitchen and the roof, and further directing the landlord to execute the *257 permit applications required for such work. The need for such relief was occasioned by the removal of the exterior exhaust vent that the tenant had originally installed, with the landlord’s consent, in the south wall of the building, which bounds the demised premises. The landlord acceded to an adjoining property owner’s demand for the removal of the original exhaust vent from the south wall; the demand was made on the ground that such equipment encroached on the adjoining parcel. As more fully discussed below, the tenant demonstrated that it is likely to succeed in proving that the roof of the building is the only viable location for a new exterior exhaust vent; that the tenant will suffer irreparable harm (namely, the loss of the use of its kitchen and the loss of its liquor license) absent such provisional relief; and that the equities balance in the tenant’s favor. While the alterations in question physically encroach on portions of the building (specifically, the roof and second floor) outside the demised premises, the record establishes that such encroachment does not materially detract from the beneficial enjoyment of such property.
We modify Supreme Court’s preliminary injunction, however, to vacate the portion of the order directing the landlord to permit the tenant to relocate its air conditioning unit to the roof of the building. The tenant failed to demonstrate a likelihood that it will ultimately succeed in proving that it has a right to such relief on a permanent basis. In particular, the tenant failed to present any evidence that the relocation of the exterior exhaust vent (to which the air conditioning unit is connected) requires that the air conditioning unit itself also be relocated from the demised premises to the roof. While it may be that placing the air conditioning unit on the roof would allow the tenant to upgrade the quality of temperature control in the demised premises, nothing in the lease requires the landlord to afford the tenant such an accommodation.
Factual Background
In November 2002, defendant King Sing Trading, Inc. (HST), as landlord, and plaintiff Second on Second Café, Inc. (Café), as tenant, entered into a lease of premises on the first floor of HST’s building at 27 Second Avenue in Manhattan. The lease is for a term of 10 years, beginning on February 1, 2003, and ending on January 31, 2013. The lease provides (in typewriting on the printed form) that Café is to use and occupy the demised premises as a “[b]ar (dancing is forbidden),” with the further *258 specification that “fast food cooking on the premises is permitted.” The lease also provides that HST made no representations as to the physical condition of the demised premises and that Café, having inspected the premises before entering into the lease, accepted the space from HST “as is.”
It is undisputed that, before opening its establishment, Café spent at least $500,000 renovating the demised premises and bringing the space up to code. Specifically, Café (as alleged in its verified complaint) “gutted the entire first floor of the [building, installed a new kitchen, two bars, a Karaoke room with soundproofing and lighting, new bathrooms, furniture, fixtures and restaurant equipment.” HST does not dispute that these renovations were made with its knowledge and consent, as required by the lease.
Among the improvements Café effected were an exterior vent for the release of exhaust from the demised premises’ kitchen and heating and air conditioning units. The vent, which provided ventilation for the kitchen as required by the Building Code and the Fire Prevention Code of the City of New York (see Administrative Code of City of NY § 27-758 [b]; § 27-4275), was located in the building’s south exterior wall and was connected by ductwork to the equipment to be vented. HST’s principal, Lai Ha Wong, as owner, signed a work permit application, dated March 27, 2003, to which were attached drawings of the “[d]etail of [the] proposed kitchen exhaust hood,” covering the stove, deep fryers and rice cooker. The drawings showed that the kitchen exhaust hood, as well as the demised premises’ air conditioning unit, would be vented through the south wall of the building.
The property immediately adjacent to the subject building on the south is 12-26 East First Street (hereinafter, the adjacent property). In 2006, the owner of the adjacent property, CVP III, LLC (CVP), began construction of a new apartment building on that parcel. In connection with the construction of the new building, CVP complained to HST that the exhaust vent that Café had installed on the south side of HST’s building encroached on the adjacent property. In November 2006, HST and CVP entered into a license agreement providing, among other things, that HST, in exchange for a payment of $25,000, would permit CVP to remove “the flue pipe and vent” on the south side of HST’s building.
By letter dated March 2, 2007, CVP advised Café that CVP intended, pursuant to its license agreement with HST, “to *259 remove the flue pipe and vent which encroach over [the adjacent] property.” The letter continued: “Please be aware that, once the flue pipe and vent are removed, the restaurant in the first floor of your building will not be in compliance with Building Code regulations regarding kitchen venting and may not be able to operate its kitchen safely.” Subsequently, by letter dated March 21, 2007, CVP informed Café that “we have proceeded to cut the bottom part of the flue pipe and vent servicing your kitchen ventilation and heating/air conditioning system, which were encroaching over our property.” The March 21 letter added: “Please be aware that now that the flue pipe and vent are cut, your kitchen and air conditioning system will not be in compliance with Building Code regulations and you may not be able to operate them safely.”
After the removal of the vent from the south wall of the building, Café had no choice but to stop using its kitchen until a new venting system was in place. Café alleges that the inability to use its kitchen caused an immediate and substantial loss of revenue. Food sales were totally eliminated, and liquor sales and party bookings allegedly declined due to the unavailability of food at the bar. Café also alleges that the lack of an exhaust vent has interfered with its ability to operate its heating and air conditioning systems. Moreover, the inability to prepare food threatened to destroy the business altogether, as Café’s liquor license is conditional on its operation of a restaurant in its establishment. If Café were forced out of the demised premises due to the inability to use the kitchen, not only would it forfeit its $500,000 investment in the renovation of the demised premises, but, in addition, it would lose the goodwill it developed at the demised premises over the four years it operated the bar before March 2007 (when CVP removed the vent).
After CVP closed the vent on the south side of the building, Café retained an architectural firm to prepare new plans for venting the kitchen. The architectural firm drew up plans for a new vent to be installed on the roof of the building and for ductwork to run from Café’s kitchen through the second floor (which is not part of the demised premises) to the proposed new vent on the roof. The plans also contemplated relocating Café’s air conditioning unit to the roof. When presented with the plans, HST refused to permit Café to make the proposed alterations.
Prior Proceedings in this Action
In August 2007, Café commenced the instant action against HST. Based on HST’s acquiescence in the removal of the side *260 vent and its refusal to consent to the installation of a new vent on the roof, Cafe’s verified complaint pleads causes of action for breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with prospective economic advantage, partial actual eviction and partial constructive eviction. The complaint seeks, among other relief,
“a mandatory injunction requiring [HST] [to] permitt ] [Café] to relocate its kitchen exhaust vent and air conditioning equipment to the roof of the Building and requiring [HST] to cooperate with [Café] and to sign all necessary building permits and other documents necessary to undertake such installation.”
Upon commencing this action, Café moved by order to show cause for a mandatory preliminary injunction requiring HST to permit Café to install a new vent and its air conditioning unit on the roof in accordance with the plans prepared by Café’s architect and to execute the permit applications necessary to perform such work. In support of its application, Café submitted an affidavit by Gianni Intili, the architect who prepared the plans Café sought to implement. Intili gave the following explanation for installing the new vent on the roof:
“It is not possible to vent the kitchen . . . through the north, south or west exterior walls of the Building, as those walls are flush with the property lines of the property on which the Building is located, and a ten-foot minimum set back from the nearest property line is required for the installation of an exhaust vent or flue. In addition, [Café] cannot vent through the east side of the Building because that is the street facade. Therefore, the only feasible method of venting the kitchen in the Premises is ... to vent it through the roof of the Building.”
Regarding the plans he prepared for the installation of a new vent on the roof (which were annexed to his affidavit), Intili elaborated as follows:
“The relocation of the exhaust vent and air conditioning equipment to the roof of the Building is perfectly safe and legal and would not disrupt the use of the interior portions of the Building. The interior duct work would run from [Café’s] kitchen, through a stairwell and through a space directly *261 above the kitchen that is presently unoccupied. The interior duct work would be concealed in a two-hour fire-rated sheet rock partition, which would blend in with the surrounding interior walls, and could easily be removed upon the termination of [Cafe’s] lease to the Premises.”
Intili estimated that “[t]he cost of removing the interior duct-work and air conditioning units and restoring the Building to its current condition would be approximately $9,000.00.”
HST did not submit papers opposing Cafe’s application for a mandatory preliminary injunction. When the hearing on the application was held (by telephone) on August 14, 2007, HST was represented only by its vice-president, who is not a lawyer. Supreme Court, noting that a corporate litigant was required to appear by counsel, granted the requested preliminary injunction, issuing an order that directed HST “to execute all necessary building permit applications + other papers required for installation of A-C equipment on roof of building + plaintiff permitted to vent kitchen exhaust fan pursuant to Exhibit B plans,” i.e., the plans annexed to Intili’s affidavit for the installation of a vent and air conditioning unit on the roof and related ductwork. The court directed Café to post a bond or undertaking in the nominal amount of $100. The court’s order (the August 2007 order) was entered on August 17, 2007.[1]
In November 2007 (at which time Cafe’s alterations had not yet been made), HST, through counsel, moved in Supreme Court for an order (1) granting “clarification” of whether the August 2007 order was granted on default; (2) to the extent the August 2007 order was granted on default, vacating such default; and (3) vacating or modifying the August 2007 order on the merits. In support of this motion, HST submitted an affidavit by its vice-president, Stephanie Wong. With regard to the merits, Wong took the position that plaintiff was not entitled to installation of a kitchen exhaust vent outside the demised premises because the lease provided that the demised premises were to be operated as a “bar,” and, Wong asserted, “[a] fully equipped kitchen is not critical to the operation of a bar.” Wong further contended that Café did not “provide [ ] any reason for the *262 relocation of the air conditioning unit [from the demised premises to the roof], other than its conclusory statement that the relocation is necessary.”
HST also submitted an affidavit by architect Julio Cesar Leder-Luis in support of its motion. While Leder-Luis did not dispute that a new vent was required to enable Café to resume operation of its kitchen, he opined, based on his inspection of the building, that a new vent could be installed “through the Building’s front facade, between the first and second floors.” Leder-Luis further opined that it was unnecessary to relocate the air conditioning unit from the demised premises to the roof. “[I]f further ventilation of the air-conditioning [unit] is needed,” he maintained, it “can be vented through the Building from the front facade.”
In the event the court declined to vacate the preliminary injunction altogether, HST’s motion sought to increase the amount of the bond Café was required to post. In this regard, HST’s papers noted that Intili, Café’s own architect, had estimated that the cost of removing the proposed installations would be about $9,000. Leder-Luis, HST’s architect, estimated that the cost of implementing Café’s plans could exceed $80,000.
In opposition to HST’s motion, Café submitted, inter alia, an affidavit by its president, Jack Zhang, and another affidavit by its architect, Intili. Responding to HST’s contention that a kitchen was not essential to the operation of a bar, Zhang pointed out that the lease specifically permits Café to carry out “fast food cooking” on the demised premises. Zhang further noted that, in April 2003, HST’s principal, Lai Ha Wong, had signed an application to change the occupancy group designation of the demised premises on the building’s certificate of occupancy “from Group E (Store) to Group F-4 (Restaurant).” The opposition affidavit of Intili, Café’s architect, disputed the contention of Leder-Luis (HST’s architect) that a new vent could be installed in the building’s front facade. In this regard, Intili averred:
“If Mr. Leder-Luis means to suggest that the flue pipe [from the vent] could be run up the front facade of the Building to the roof, this is incorrect, as the facade of the Building is flush with the property line and the flue pipe cannot extend over a public sidewalk, which is city property.
“Second, even if Mr. Leder-Luis meant to suggest that [Café’s] air conditioning and kitchen exhaust *263 could be vented ‘through the Building’s front facade,’ the kitchen exhaust (as opposed to the air conditioning) cannot be vented through the front facade of the Building without the addition of a ‘water precipitation system’ to remove odors and grease-laden vapors from the exhaust.
“Facade-vented water precipitation units are usually found only [in] high-rise buildings or in other buildings where special considerations make it impossible to install a roof vent. Water precipitation systems are not typically found in low-rise buildings such as the one where [Café] is located, and the Building Department will not typically issue a building permit to install a street facade-vented water precipitation system in a low-rise building.
“The installation of a front-vented water precipitation system in a low-rise building would therefore require the filing of a ‘special reconsideration’ application with a senior commissioner of the Building Department. Based upon my experience, such a ‘special reconsideration’ application would almost certainly be denied and would be a waste of time. I therefore stand by my earlier opinion that the only feasible method of venting the kitchen in the Premises is therefore to vent it through the roof of the Building.”
In reply to Intili’s opposition affidavit, HST submitted a further affidavit by architect Leder-Luis. In this affidavit, LederLuis reiterated his view that a new “air-conditioning vent and kitchen flue pipe could be installed along the front portion of the Building, facing Second Avenue,” and plans for such a system were attached. Leder-Luis did not, however, specifically address Intili’s contentions that a flue pipe could not be run up the building’s front facade due to encroachment on public property and that venting the kitchen through the building’s front facade would require the installation of a water precipitation system, a permit for which was unlikely to be obtained.
Regarding the location of the air conditioning unit, LederLuis stated in his reply affidavit:
“As to [Café’s] claims that the air-conditioning system needs to be re-located to the roof, I respectfully submit to the Court that such re-location is *264 unnecessary, as the mere removal or re-location of the vents does not, in and of itself, warrant relocating the air-conditioning system.”
After hearing oral argument, Supreme Court, by order entered November 26, 2007, granted HST’s motion to the extent of clarifying that the August 2007 order had been rendered on HST’s default, vacating that default, and increasing to $10,000 the amount of the bond or undertaking Café was required to file. The court confirmed the previously granted mandatory preliminary injunction in all other respects. This appeal by HST ensued.[2]
ANALYSIS
“The party seeking a preliminary injunction must demonstrate a probability of success on the merits, danger of irreparable injury in the absence of an injunction and a balance of equities in its favor” (Nobu Next Door, LLC v Fine Arts Hous., Inc., 4 NY3d 839, 840 [2005], citing CPLR 6301). Moreover, a mandatory preliminary injunction (one mandating specific conduct), by which the movant would receive some form of the ultimate relief sought as a final judgment, is granted only in “unusual” situations, “where the granting of the relief is essential to maintain the status quo pending trial of the action” (Pizer v Trade Union Serv., Inc., 276 App Div 1071 [1950], citing Bachman v Harrington, 184 NY 458, 464 [1906] and Kakalios v Mesevich, 259 App Div 112 [1940]; see also Sithe Ener *265 gies, Inc. v 335 Madison Ave., LLC, 45 AD3d 469, 470 [2007]; SHS Baisley, LLC v Res Land, Inc., 18 AD3d 727, 728 [2005]; St. Paul Fire & Mar. Ins. Co. v York Claims Serv., 308 AD2d 347, 349 [2003]; Rosa Hair Stylists v Jaber Food Corp., 218 AD2d 793, 794 [1995]).
While courts are generally “reluctant” to grant mandatory preliminary injunctions (Jameson v Hartford Fire Ins. Co., 14 App Div 380, 391 [1897, Barrett, J., concurring]), and such relief will be granted only where “the right [thereto] is clearly established” (id.; see also Rosa Hair Stylists, 218 AD2d at 794 [the movant must show “a clear right to mandatory injunctive relief”]), cases do arise where a provisional remedy of this nature is appropriate (see Chrysler Corp. v Fedders Corp., 63 AD2d 567 [1978] [granting mandatory preliminary injunction directing defendant to secure funds for payment of dividends sought by plaintiff in the action pending determination thereof]; cf. McCain v Koch, 70 NY2d 109, 116 [1987] [“in a proper case Supreme Court has power as a court of equity to grant a temporary injunction which mandates specific conduct by municipal agencies”]). As the Court of Appeals observed more than a century ago: “[W]here the complainant presents a case showing or tending to show that affirmative action by the defendant, of a temporary character, is necessary to preserve the status of the parties, then a mandatory injunction may be granted” (Bachman v Harrington, 184 NY at 464).
To recapitulate, the order under review directed HST to permit Café to install a new vent for the demised premises’ kitchen exhaust on the building’s roof and to install air conditioning equipment (theretofore located in the demised premises) on the roof. The alterations (for which HST was also directed to sign the necessary work permit applications) were to be effected in accordance with the plans prepared by Café’s architect (included in the record), which plans necessarily included ductwork to connect the kitchen equipment to the new vent on the roof. For reasons to be discussed below, we analyze the propriety of the relief regarding the location of the new vent and associated ductwork separately from the propriety of the relief regarding the relocation of the air conditioning equipment from the demised premises to the roof.
Venting the Kitchen Through the Roof
In considering whether Café has demonstrated a likelihood of succeeding on the merits of its claim for a permanent injunction allowing it to vent its kitchen through the roof of HST’s build *266 ing, we start by recognizing that the lease expressly entitles Café to conduct “fast food cooking” on the demised premises— meaning that Café has a right to operate a commercial kitchen under the lease. It appears that the parties specifically contemplated that Café would have this right, as the reference to “fast food cooking” is typewritten onto the printed form of the lease. Further, HST has not disputed that it gave its consent (as required by the lease) to Café’s installation of the kitchen, among other improvements Café made to the demised premises at a total cost of about $500,000. Nor is it disputed that HST’s principal signed an application to change the occupancy use group designation of the demised premises on the building’s certificate of occupancy “from Group E (Store) to Group F-4 (Restaurant).”
It is also undisputed that a commercial kitchen requires a vent and ductwork for the release of exhaust, as required by the Building Code and the Fire Prevention Code of the City of New York (see Administrative Code of City of NY § 27-758 [b]; § 27-4275). At the inception of the tenancy, this need was met by the vent Café installed, with HST’s consent, in the south exterior wall of the building. Four years after the Café opened for business, however, HST permitted CVR the owner of the adjoining property, to remove this vent on the ground that the structure encroached over the property line. Café does not dispute that the vent in the south wall encroached on the adjacent property.
To address the removal of the vent from the south wall, Café prepared plans for a new vent on the roof of the building, with ductwork running from the kitchen to the roof through the building’s second floor. HST, pointing out that the second floor and the roof are not part of the demised premises, refused to consent to the implementation of these plans and suggested an alternative that presumably would avoid or minimize the use of property outside the demised premises. On this record, however, Supreme Court correctly found that the plans submitted by Café were the only feasible means for venting the kitchen, now that the south exterior wall is unavailable due to the objection of the adjoining property owner.[3]
The question that emerges from the foregoing is whether Café’s express right under the lease to operate a commercial *267 kitchen on the demised premises carries with it an implied right to install an exhaust vent required for the operation of its kitchen equipment, along with the associated fan and ductwork, where, as here, it is established that the only feasible way to provide such venting is through portions of the building outside the demised premises. HST argues that no such right on the part of Café, as tenant, to use portions of the building outside the demised premises may be implied under the lease, no how matter insubstantial the burden on the party in possession of the space in question. In this regard, HST relies on sections of the lease providing that Café, after inspecting the demised premises, accepted them “as is,” with the express understanding that HST made no representations as to their condition. HST also points out that it has no obligation under the lease to provide Café with air conditioning, heating or ventilation. For the reasons that follow, we disagree.
Under a lease, the tenant acquires not only rights to the premises specifically leased, but also “rights outside the demised premises that pass to the tenant whether or not mentioned” (1 Friedman on Leases § 3:2.2, at 3-14 [Randolph 5th ed]). Rights of the latter kind are known as appurtenances and are generally defined as “incorporeal easements or rights and privileges which are essential or reasonably necessary to the full beneficial use and enjoyment of the property conveyed or leased” (1 Dolan, Rasch’s Landlord and Tenant—Summary Proceedings § 7:5, at 304-305 [4th ed]; see also Doyle v Lord, 64 NY 432, 437 [1876]; Jasinski v City of New York, 290 AD2d 237, 238-239 [2002]; Fabrycky, Inc. v Nad Realty Corp., 261 App Div 268, 269 [1941], lv denied 261 App Div 987 [1941]; Greenblatt v Zimmerman, 132 App Div 283, 285-286 [1909]; Stevens v Taylor, 111 App Div 561, 562-563 [1906]; Matter of Hall v Irvin, 78 App Div 107, 110-111 [1903]; 74 NY Jur 2d, Landlord and Tenant § 165; 49 Am Jur 2d, Landlord and Tenant §§ 500, 502; 52 CJS, Landlord and Tenant § 676; Stoebuck and Whitman, Property § 6.22, at 271 [3d ed] [“The tenant’s estate may carry with it by implication rights in surrounding areas the landlord owns”]; W.R. Habeeb, Annotation, Easements or Privileges of Tenant of Part of Building as to Other Parts Not Included in Lease, 24 ALR2d *268 123; cf. Prospect Owners Corp. v Sandmeyer, 62 AD3d 601, 603 [2009] [roof held “not an appurtenance to defendants’ apartment . . . since its use is neither essential nor reasonably necessary to defendants’ full beneficial use and enjoyment of the apartment”]). A lease need not refer to “appurtenances” in order to pass them to the tenant (see Lemkin v Gulde, 25 Misc 2d 144, 149 [Sup Ct, Nassau County 1960, Meyer, J.], citing, inter alia, Kingsway Realty & Mtge. Corp. v Kingsway Repair Corp., 223 App Div 281, 284 [1928]; 1 Dolan, Rasch’s Landlord and Tenant—Summary Proceedings § 7:6, at 305). A tenant’s appurtenant rights implied under a lease are generally enforceable in equity (see Stahl & Jaeger v Satenstein, 233 NY 196, 197 [1922, Cardozo, J.], revg 194 App Div 228 [1920] [reinstating judgment restraining landlord from posting advertisements on the walls enclosing tenant’s demised premises on the ground that tenant’s “lease of an ‘entire floor’ must carry with it the appurtenant right to exclude signs, advertising the business of persons other than the tenant” from such walls]; see also 487 Elmwood v Hassett, 107 AD2d 285, 288 [1985] [interference with tenant’s appurtenant rights may constitute an actual partial eviction]; 2 Dolan, Rasch’s Landlord and Tenant—Summary Proceedings § 28:14, at 334 [“Where a landlord wrongfully expels or excludes a tenant from the use of an appurtenance to his leased premises for a substantial period of time, this will constitute an actual partial eviction” (footnotes omitted)]).
The appurtenance concept is most frequently applied to uses of the landlord’s retained property that existed at the time the lease was made (see e.g. Greenblatt v Zimmerman, supra [the right to store coal in a cellar bin was an appurtenance to the lease of another portion of the building used as restaurant, where, prior to the lease, landlord operated the restaurant and stored coal for it in the cellar bin]), and decisions in this area often draw on the law of implied easements (see 1 Friedman on Leases § 3:2.2, at 3-15). Still, “the implication of a right of use in a lease is likely to be an exercise in contract interpretation more than an application of any rigid rule of property law” (id. at 3-16). Thus, implied appurtenant rights have been held to arise from the parties’ evident intent at the time they entered into the lease even in the absence of any showing that the use in question antedated the lease (see Kaiser v Magis, 120 NYS2d 510, 511 [App Term, 1st Dept 1953] [where “at the time of the letting, . . . (landlord) gave the tenant, occupant of the second floor space, the key to the bathroom on the first floor,” the *269 tenant thereby acquired “an easement appurtenant to the tenancy” to use that bathroom]; Lemkin v Gulde, 25 Misc 2d at 146, 149-150 [finding that tenant, who entered into lease of a suite in a medical office building before the building’s completion, had an implied appurtenant right to have open land adjoining the building remain in that condition based on evidence of the parties’ intent at the time the lease was executed]).[4]
An example of a fact pattern in which the courts have consistently recognized an implied right of the tenant based solely on the parties’ evident intent upon executing the lease, not on any preexisting use of the landlord’s retained property, is the situation in which the landlord permits the tenant to move its property into the demised premises by a particular method, which is deemed to imply assent to removal of such property in the same manner at the end of the term (see Fabrycky, Inc. v Nad Realty Corp., 261 App Div at 269 [“As the landlord assented to the tenant bringing the fixtures into the loft building via the elevator at the beginning or during the term, it must be deemed to have assented to their removal at the expiration of the term in the same manner”]; Marder v Heinemann, 114 App Div 794, 795 [1906] [“By assenting to the (tenant’s) removal of the plate glass to take the ice box in (to the demised premises), the (landlord) assented to the taking of it out in the same way”]; Kelsey v Durkee, 33 Barb at 413 [tenant had implied right to bring bulky machinery necessary to the intended use of the demised premises into the same by making openings in the walls and then closing them, and, at the end of the term, to remove the machinery by the same method]).
The above-cited decision of Kelsey v Durkee, in holding that the landlord was obligated to permit the tenant to remove its machinery from the demised premises in the same manner such machinery had been brought in, stressed that the implication of this right on the part of the tenant was necessary to give effect to the lease’s provision that “the premises were demised to be *270 used as a soda, salératus and drug factory, with a steam engine and furnace” (33 Barb at 413). Since the specified machinery was too large to fit through the building’s doors, the court observed, “the building could not have been applied to the uses for which it was demised” unless the tenant were deemed to have such a right (id. at 413). In this regard, the Kelsey court concluded: “[A]ny thing necessary to the use and enjoyment of the demised premises for the purposes intended by the parties must be implied where it is not expressed” (id. [emphasis added]).
The principle expressed in the sentence just quoted from Kelsey v Durkee (supra) was subsequently applied in Gans v Hughes (supra). The tenant in Gans leased the ground floor and part of the cellar of a building “to be used as a bakery” (14 NYS at 930). Just before the term of the lease commenced, while he was building a bakery oven in the demised premises, the tenant was permitted by the landlord to connect the demised premises to a water main pipe in a part of the cellar outside the demised premises (id. at 931). After the tenant had been operating a bakery pursuant to the lease for more than three years, the landlord cut off his water supply without warning. The tenant sued to restrain the landlord from interfering with the demised premises’ water supply. In affirming a judgment granting such relief, the court explained:
“The [landlord’s] contention ... is substantially that the right to use the water connection in the cellar [outside the demised premises] was not included in the lease, and that the permission from [the landlord] to [the tenant] to make the connection in the cellar was a mere license which [the landlord] had a right to revoke at his pleasure. We do not think this contention can be maintained. Leases, like other agreements, are to be construed so as to carry out the intention of the parties. When premises are leased for an expressed purpose, everything necessary to the use and enjoyment of the demised premises for such expressed purpose must be implied where it is not expressed in the lease. Kelsey v. Durkee, 33 Barb. 410; McAdam, Landl. & Ten. 114. It follows, therefore, that when [the tenant] leased the premises in question ‘to be used as a bakery’ he acquired also such accompaniments and appurtenances as usually belong to and were neces *271 sary to enable him to carry on the bakery business. It appears here from the findings, supported by evidence, that water was necessary and incidental to the use of the cellar as a bakery . . . For [the landlord], at this late day, to seek to sever the water connection, is an interference with the same use of the premises for the purpose for which they were hired, and equity will intervene to prevent such interference” (14 NYS at 931 [emphasis added]).
Under the principle of Gans v Hughes and Kelsey v Durkee, we hold that this record establishes a substantial likelihood that Café will succeed on the merits of its claim for a permanent mandatory injunction directing HST to permit it to install a new exhaust vent and fan for its kitchen in the roof of HST’s building and to install ductwork running from the kitchen to the new vent on the roof. To reiterate, the lease expressly contemplates that Café will engage in “fast food cooking” in the bar it operates in the demised premises, which is to say that the establishment is to be operated, in part, as a restaurant. It is undisputed that the safe and lawful operation of a restaurant kitchen requires that the cooking equipment be vented to dispose of exhaust. Café, through its architect’s affidavits, has established that, since the building’s south exterior wall can no longer be used for venting, the only feasible means of venting the kitchen is through the building’s roof, which involves some minimal use of portions of the building (specifically, the roof and second floor) outside the demised premises. Given these circumstances, Café established for purposes of its motion for preliminary injunctive relief that venting the kitchen through the roof is something necessary to the use and enjoyment of the demised premises for one of the express purposes for which Café entered into the lease, namely, the operation of a restaurant, and the right to vent the kitchen in this manner is therefore an implied appurtenant right under the lease. Stated otherwise, a promise by HST to permit Café to install a system by which to vent its kitchen, and, if such venting is otherwise impossible, to make limited use of portions of the building outside the lease for that purpose, “is in fact implicit in the [lease] agreement viewed as a whole” (Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 69 [1978]; see also 74 NY Jur 2d, Landlord and Tenant § 83).
In considering the likelihood that Café will succeed on the merits, we find unavailing HST’s reliance, in opposing Café’s *272 application, on the sections of the lease providing that Café, after an inspection, accepted the demised premises “as is.” Such standard provisions do not override the landlord’s implied obligation to permit the tenant to make reasonable alterations (at the tenant’s own expense) without which the tenant’s intended use of the demised premises, as provided by the lease itself, would be impossible.[5]
[6] Nor does it avail HST that it has no obligation under the lease to provide Café with air conditioning, heating or ventilation. The order appealed from does not require HST to furnish any such services to Café; rather, HST is being required only to make reasonable accommodations to enable Café to furnish such services to itself, at Café’s own expense.
It remains for us to consider whether Café established that it will suffer irreparable harm absent injunctive relief pending determination of the action, and whether it has established a balance of the equities in its favor. Insofar as the motion was addressed to venting the kitchen through the roof, we find that these requirements were satisfied.
As to irreparable harm, it is undisputed on this record that Café’s inability to operate a restaurant in its establishment potentially jeopardized its liquor license. Further, although Café did not quantify the revenue it lost as the result of its inability to operate its kitchen, it is obvious that the unavailability of hot food would make it difficult for a bar to book parties for corporate customers and other groups. Such parties apparently make up a significant proportion of the business of Café’s karaoke-oriented bar. Café’s president, Jack Zhang, stated in his affidavit that, due to the inability to operate the kitchen, Café had “missed out [on] the [2007] Christmas party season,” and that he had “been forced to borrow $100,000 to keep [Café’s] business running pending resolution of this suit.” If Café’s ability to do business at the demised premises were lost pending determination of the action, it would face the forfeiture of its $500,000 investment in the renovation of its space and the loss of the goodwill it built up at this location during its first four years of operation. We reject HST’s argument that the loss *273 of the goodwill of a viable, ongoing business does not constitute irreparable harm warranting the grant of preliminary injunctive relief (see Waldbaum, Inc. v Fifth Ave. of Long Is. Realty Assoc., 85 NY2d 600, 607 [1995]; J. N. A. Realty Corp. v Cross Bay Chelsea, 42 NY2d 392, 399-400 [1977]; FTI Consulting, Inc. v PricewaterhouseCoopers LLP, 8 AD3d 145, 146 [2004] [irreparable injury found because “the loss of goodwill” was “not . . . readily quantifiable”]).[6]
Given the strong case Café made for its likelihood of success on the merits, we are satisfied that Café’s showing of irreparable harm warranted relief. Moreover, we find that Café demonstrated that it met the heightened standard for the grant of a mandatory preliminary injunction, namely, that the situation was an “unusual” one in which a preliminary injunction mandating specific conduct by the movant’s adversary was “essential to maintain the status quo pending trial of the action” (Pizer, 276 App Div at 1071). In this regard, it is significant that the record establishes that the changes effected pursuant to the mandatory preliminary injunction can readily be undone, if HST desires, upon the expiration of the lease or in the event (unlikely, we think) that HST prevails in this action. Specifically, it is undisputed that the vent, fan and ductwork can be removed without undue hardship, at the reasonable cost of $9,000.
We also find that the equities balanced in favor of granting Café relief. The installation of the vent and fan on the roof, and of ductwork through the second floor and to the roof, involves minimal impingement on portions of the building outside the demised premises, can readily be undone if appropriate, and, so far as can be discerned from this record, does not materially interfere with HST’s reasonable enjoyment of its retained property or with HST’s ability to lease that space to a tenant (cf. Tong v Feldman, 152 Md 398, 405-406, 136 A 822, 824-825 [1927] [holding that tenant of upper floors of a building, who was found to have an implied easement for the transmission of *274 gas to his premises through a pipe in the cellar, was entitled to enlarge the meter and pipe in the cellar to meet current needs “if the projected changes do not materially interfere with (the) reasonable enjoyment of the cellar” by the tenant of that space]; Ragona v Di Maggio, 42 Misc 2d 1042, 1044 [Sup Ct, Queens County 1964] [plaintiff property owners, who had implied easement for maintenance of electric line through ceiling of garage on defendant’s adjoining property, were entitled to increase the line’s voltage and size to meet increased electrical requirements where “the increase in the burden upon defendant’s premises is relatively insignificant”]). By contrast, as previously discussed, denying Café the relief in question would have subjected it to probable irreparable harm.[7]
Relocation of the Air Conditioning Unit to the Roof
It appears to be undisputed that the exhaust vent on the south exterior wall of the building served not only Café’s kitchen equipment but also its air conditioning and heating units, which were located within the demised premises. Thus, the removal of the vent from the south side of the building posed problems for the heating and cooling of the demised premises. Apparently, Café continued to heat and cool the demised premises after the side vent was removed (by means that are not fully explained in the record), but the effectiveness of the temperature control was substantially reduced.
In its motion for a preliminary injunction, Café sought to require HST to permit it not only to install a vent and fan on *275 the roof of the building (with connecting ductwork to the demised premises), but also to relocate the air conditioning unit itself from the demised premises to the roof.[8] Under the plans prepared by Café’s architect, the air conditioning unit would rest “on a frame of steel beams erected over the western corner of the building.” In the oral argument on HST’s motion to vacate its default, HST’s counsel brought to Supreme Court’s attention that its architect, Leder-Luis, opined in his reply affidavit that “the mere removal or re-location of the vents does not, in and of itself, warrant re-locating the air-conditioning system.” Counsel further argued that, even if Café’s arguments concerning the need to vent through the roof were accepted, that did not demonstrate any need to move the air conditioning unit itself to the roof. Specifically, HST’s counsel contended that Café failed to present any evidence that connecting the air conditioning unit, while it remained in the demised premises, to the ductwork leading to the new vent on the roof'would not suffice to restore air conditioning function of the same quality the demised premises enjoyed before the side vent was removed, without the necessity of moving the air conditioning unit itself to the roof. Supreme Court nonetheless confirmed the aspect of the original preliminary injunction that directed HST to permit the installation of the air conditioning unit on the roof of the building.[9]
On appeal, HST makes the same argument concerning the relocation of the air conditioning unit that its counsel made to Supreme Court. Café has not offered any substantive response to this argument. Our attention has not been directed to, and *276 we have not located on our own, any evidence in the record explaining why Café’s air conditioning unit, while remaining in the demised premises, could not be vented through the roof by way of the new ductwork and vent.
In view of the foregoing, we conclude that the order appealed from should be modified to vacate the direction to HST to permit Café to install the air conditioning unit on the roof. We emphasize that we hold only that the evidence in the record as it now exists is insufficient to support that aspect of the preliminary injunction Supreme Court granted.
Accordingly, the order of the Supreme Court, New York County (Karla Moskowitz, J.), entered November 26, 2007, which, insofar as appealed from, confirmed a prior order, same court and Justice, entered August 17, 2007, to the extent that order granted plaintiff a mandatory preliminary injunction directing defendant to permit plaintiff to install a new kitchen exhaust vent and fan on the roof of defendant’s building, and to install ductwork connecting plaintiff’s kitchen equipment in the demised premises to the aforementioned vent and fan on the roof, and to install an air conditioning unit on the roof, and to execute work permit applications for such work, all to be done in accordance with plans in the record prepared by RIP Construction Consultants, Inc., should be modified, on the law and the facts, to vacate the direction regarding the relocation of the air conditioning unit to the roof, and otherwise affirmed, without costs.
Mazzarelli, J.P., Saxe, Acosta and DeGrasse, JJ., concur.
Order, Supreme Court, New York County, entered November 26, 2007, modified, on the law and the facts, to vacate the direction regarding the relocation of the air conditioning unit to the roof, and otherwise affirmed, without costs.

. After retaining counsel, HST filed a notice of appeal from the August 2007 order and then moved this Court for a stay of that order. Café cross-moved to hold HST in contempt. By order dated September 25, 2007, we denied both the motion and the cross motion. HST subsequently withdrew its appeal from the August 2007 order.

. After the necessary permit applications were signed by HST and filed with the Department of Buildings, that agency granted the permits for the implementation of Café’s proposed alterations on December 10, 2007. Construction (paid for by Café) began in January 2008 and was completed the following month. Pointing to the fact that the alterations at issue have been completed, Café argues that HST’s appeal should be dismissed as moot. This argument is unavailing, as Café itself argued to Supreme Court that the alterations it sought could be undone without undue hardship at a cost of $9,000. In this regard, it is also significant that, shortly after filing its appeal from Supreme Court’s order entered on November 26, 2007, HST moved this Court for a stay of that order, which motion was denied on January 21, 2008. Café’s argument that the instant appeal is somehow barred by laches is without merit. Also unavailing are Café’s arguments that Supreme Court should not have vacated the default by HST that resulted in the August 2007 order; since Café has not taken an appeal from the order vacating HST’s default, we cannot disturb those aspects of the order that aggrieve only Café. Even if Café had taken an appeal, we would reject its argument that HST’s motion was untimely, as HST’s motion was one for relief from a prior order on the ground of excusable default, and was made well within the one-year time frame applicable to such motions (see CPLR 5015 [a] [1]). Further, Supreme Court did not err in finding the default excusable.

. As previously discussed, HST’s papers in support of its motion to vacate the preliminary injunction rendered on its default included an affidavit by its architect, Leder-Luis, opining that Café’s kitchen could be vented through the building’s front facade. To this suggestion, Café’s architect, Intili, responded (n. cont’d) *267 that venting the kitchen through the front facade would require either a flue pipe running up the facade, which would impermissibly encroach on city property, or a water precipitation system atypical of low-rise buildings, for which a permit was unlikely to be issued. The reply affidavit of Leder-Luis failed to address these objections.

. See also Rainbow Shop Patchogue Corp. v Roosevelt Nassau Operating Corp., 60 Misc 2d 896, 898 (Sup Ct, Kings County 1969), affd 34 AD2d 667 (1970) (implied easement appurtenant to a lease “may be proved by circumstances showing an intention to include the same in [the] lease”); Anixter v Bangor Realty Corp., 104 Misc 613, 616 (Sup Ct, NY County 1918) (tenant, who operated a cigar and candy stand in an office building, was found to have an implied easement against obstruction of the hallway in which stand was situated, where “from all the facts and circumstances presented it is . . . clearly apparent that such intention was undoubtedly within the contemplation of the parties when the [lease] was executed”).

. Indeed, if HST’s position were correct, it would mean that, after the execution of the lease, HST would have been entitled to refuse to permit Café to make any changes at all to the demised premises themselves, even though, at the inception of the lease, the premises were (as stated in HST’s appellate brief) “raw space, with no ventilation or air-conditioning system at all.” The implication of HST’s argument is that it was entitled, at its whim, to negate Cafe’s right to use the demised premises for the purpose expressly provided in the lease. We reject this view.

. HST also argues that, by itself, Café’s delay in seeking a preliminary injunction (from March 2007, when CVP removed Café’s vent from the south wall of HST’s building, until the following August) “fatally undermines [the] assertion that such extraordinary relief was warranted.” We find this argument unavailing, as did Supreme Court, given that it is undisputed that Café spent the five-month period in question attempting to resolve the problem with HST on a voluntary basis. Further, HST has not shown that the delay has prejudiced it in any way (see Hay Group v Nadel, 170 AD2d 398, 400 [1991], citing Weiss v Mayflower Doughnut Corp., 1 NY2d 310, 318 [1956]).

. In its opening brief on this appeal, HST also argued that, even if Supreme Court correctly granted the preliminary injunction, that relief should have been conditioned on Café’s posting a bond or undertaking in an amount greater than $10,000, the amount Supreme Court required. It is undisputed, however, that the cost of undoing the alterations at issue is only $9,000. Since Café itself has borne the expense of effecting the alterations in the first instance, there is no reason for Café to be required to post a bond or undertaking in an amount covering the cost of making the alterations. While HST’s opening brief argued that the bond or undertaking should be in an amount sufficient to cover its legal fees relating to the motion (which, it claims, already exceed $10,000), this argument is unpreserved, as it was not raised before Supreme Court. Even if the argument concerning legal fees had been preserved, it appears to be without merit, as the lease entitles HST to recover from Café only those legal fees incurred “to collect any sums or [to] give any notices of defaults.” HST does not advance any claim that Café owes it any money or that Café is in default under the lease. In any event, in its reply brief, HST does not respond to Café’s rebuttal of the challenge to the amount of the bond or undertaking, thereby apparently abandoning that aspect of the' appeal.

. It is not entirely clear from the record and briefs whether the machine Café proposes to place on the roof is an air conditioner only or a combined heating and air conditioning unit.

. The conclusion of the oral argument on the motion to vacate, held on November 21, 2007, was as follows:
“MR NEWMAN [HST’s counsel]: At the moment, I’m not addressing [where to put] the vent. I’m just suggesting, wherever the venting goes, there’s no demonstration for need to relocate the HVAC unit itself. If [the vent] goes through the roof, the HVAC unit can stay where it is [in the demised premises]. If [the vent] goes through the front facade, the HVAC can stay where it is.
“THE COURT: You can litigate that and damages or counterclaims, whatever you want to litigate . . . You’ll litigate those issues in terms of relief that the plaintiff is asking for in order to operate a restaurant during the holiday season.
“I’m granting—well, I’m not reinstating—I’m confirming the injunction as granted before, only increasing the bond.”